(No. 5353.   November 14, 1930.)

R. L. JAGELS et al., Appellants, v. F. R. COX, Receiver of the IDAHO COOPERATIVE BEET SUGAR COM-PANY, a Corporation, Respondent.

[294 Pac. 515.]

James R. Bothwell and W. Orr Chapman, for Appellants.

J. W. Porter, O. W. Witham, Frank L. Stephan and Chas. A. North, for Respondent.

BUDGE, J.—This suit was instituted by appellant Jagels and some eighty other appellants against respondent Cox, as receiver of the Idaho Cooperative Beet Sugar Company, seeking the cancelation of subscription agreements and notes given in payment thereof by each appellant. It was stipulated by the parties that the suit as brought would be maintained in its present form; that no question would be raised as to misjoinder of parties for the reason that the notes and contracts, the subject of the action, were numerous as well as the parties, and that expenses could be avoided thereby.

We shall not undertake to recite all of the facts disclosed by the record. Neither shall we enter into a lengthy discussion of the points sought to be raised. To do so would make the opinion herein unduly lengthy. Briefly,

the facts as found by the trial court concerning the development and activities of the Sugar Company are as follows: The company was organized ostensibly for the purpose of engaging in the beet sugar industry. To induce appellants and others to make stock subscriptions and to execute promissory notes and contribute moneys for the construction of beet sugar factories, its agents and representatives represented to each and all of the appellants that the company was constructing beet sugar factories at Filer, Hansen, Rupert, and other towns on the Twin Falls tract for the purpose of producing sugar from the 1920 crop of sugar beets to be grown by the farmers on said tract. It was further represented that the factories would be in operation for the crop of 1920; that stock subscribers would receive sugar at factory cost, free beet pulp, 25 per cent more in price for their beets than other factories would pay, or at least considerably more; that the company would provide truckage or would haul the beets to the factories by a system of trucks and trailers; that the company had purchased sugar-beet seed from Denmark and Holland which would grow bigger and better beets with more sugar content and be much superior to the seed now in use in the territory, and the same would be available for delivery to subscribers under their contracts to raise sugar-beets for the company; that the company had purchased and owned free and clear of all incumbrances a sugar-beet factory located at Fallon, Nevada, and that men were employed to move the same to Filer; that the company had purchased machinery and all necessary equipment for the construction of a sugar factory at Hansen; that the board of directors of said company had authorized the building of a sugar-beet factory near Rupert and that work would begin in the early fall of 1920 upon the construction of said factory; and other like false representations.

The court found that each and every of the above statements and representations made by the agents of said company were false and fraudulent and were known by the

agents of said company to be false, fraudulent and untrue, and were made for the purpose of deceiving appellants in order to induce them to purchase the stock of the company, and that, relying solely upon said false and fraudulent representations and believing the same to be true, appellants entered into contracts for the purchase of stock in said company and executed promissory notes for the unpaid balance of the purchase price of capital stock in said company.

The court further found that respondent Cox had, upon application, been appointed and qualified as receiver of the company, and that prior to the commencement of the present action an order was made on proper application authorizing appellants to maintain this action against the receiver. A trial was had before the court without a jury upon the complaint of appellants, the answer and cross-complaint of respondent, and answer to the cross-complaint by appellants. Judgment was had for respondent — for various sums of money shown to be due under respective notes of appellants. This appeal is prosecuted from the judgment.

Appellants assign and rely upon four assignments of error. First and second, that the court erred in finding "that the plaintiffs named in this finding did not testify at the trial and did not rescind or attempt to rescind their stock subscriptions prior to the institution of this action." It is urged by the appellants that the foregoing finding is contrary to law and the evidence and the findings of the court in that the evidence shows appellants demanded back their notes and refused to pay the same because of the fraudulent representations made prior to the institution of the present action; and the court did so find. It appears there is a conflict in the findings in this respect.

With a few exceptions, the various subscribers, appellants herein, did not attend any of the meetings of the company. None of the appellants herein acted as officers or directors or participated in the affairs of the company.

In all instances the subscribers were induced by fraud to subscribe for their stock and in numerous instances, immediately after discovering the fraud, they took steps to rescind their contracts and to have their notes canceled. Numerous subscribers were misled in taking prompt and proper action in this regard by reason of representations made by officers and agents of the company that they would not be required to pay their notes. In one or two instances subscribers renewed their notes or asked for extensions of time in which to pay them. None of the subscribers ratified or affirmed their contracts of subscription as would entitle the parties whose claims are herein held to be inferior to urge ratification or affirmance as against the defrauded subscribers. It is true that in numerous instances the defrauded subscribers waited until after the appointment of the receiver for the company and until the filing of the present action before disavowing their contracts of subscription. It is difficult to segregate from the voluminous record, and we shall not attempt to do so because we do not deem it necessary to a determination of the case, the various steps taken by each subscriber looking to the cancelation of his subscription and the surrender of his note. Had each action been separately tried or a separate record made as to each subscriber the exact liability of each might have been more readily determined.

The rule in England appears to be that insolvency of a corporation is an absolute bar to rescission of the stockholder's contract and consequent escape from liability where the subscription was obtained by fraud. In this country, as is observed by the annotator in 41 A. L. R. 674, 685, the decisions on this subject are in a state of more or less confusion, one line of cases supporting the English rule and the other holding that insolvency does not necessarily cut off the right of a stockholder to avoid his liability on the ground of fraud. Each case must be decided upon the particular facts and circumstances involved. If the creditors are ignorant of the fraud and extend credit on the faith of the subscriptions of the stock-

holders, their rights are superior to those of the defrauded subscribers; while on the other hand if the creditors had knowledge of the fraud, the rights of such creditors may not be superior. Although this distinction may not be clearly pointed out by the authorities, it is made apparent from the use of the term "*bona fide* creditors" or "innocent third parties" in the statement of the general rule found in the decisions.

Respondent relies upon the case of *Meholin v. Carlson,* 17 Ida. 742, 134 Am. St. 286, 107 Pac. 755, 759, to uphold his contention that in this jurisdiction the English rule has been adopted. We are in accord with the holding in that case but think it distinguishable from the instant case. The facts are entirely different. It appeared in that case that the stockholder had, for a considerable time prior to the failure of the corporation, occupied the position of stockholder, and exercised and enjoyed the rights and privileges of that relation, and received dividends on his stock. The opinion therein quotes from Morawetz on Corporations, sec. 839, as follows:

"It has accordingly been settled that, if a corporation is insolvent, a stockholder whose contract of subscription was obtained by the fraud of the company's agents, cannot diminish the security of *bona fide* creditors, by rescinding his contract to contribute the amount of capital subscribed by him."

Also quoted in *Meholin v. Carlson, supra,* is the following statement from Jones on Insolvent and Failing Corporations, sec. 399, treating of the effect of fraud on a contract of purchase of corporate stock:

"It is valid and binding until the defrauded party elects to treat it as void; and if he fails to repudiate it before the rights of innocent third parties have intervened, their equities to treat it as valid may be superior to his claim to avoid it."

It would follow in a given case that if creditors were not *bona fide* or innocent third parties, such as had knowledge of the fraud on the subscribers and did not ex-

tend credit on the faith of the subscriptions, the insolvency of the corporation or the appointment of a receiver would not bar the defrauded subscribers from rescinding or repudiating their contracts of subscription. In a fairly recent well-considered opinion, the supreme court of Utah, in *Burningham v. Burke*, 67 Utah, 90, 46 A. L. R. 466, 245 Pac. 977, 985, after reviewing the authorities at length, announced what we believe to be a proper application of the rule, as follows:

" . . . . We, upon what we regard to be the weight of authority, deduce this: Where one subscribed for or purchased stock of a solvent corporation, he, on the ground of fraud or misrepresentation, may rescind or repudiate the contract, if otherwise entitled to do so, and is not guilty of laches, even after the corporation has become insolvent or has gone into hands of a receiver, except as to subsequent creditors, who, in ignorance of the fraud and on strength of or reliance on the stock subscription or purchase in good faith and in some considerable amount, became such thereafter and before the insolvency of the company or appointment of the receiver, to show which the burden is on the receiver or such subsequent creditors."

See, also, *Johns v. Coffee*, 74 Wash. 189, 133 Pac. 4.

From a careful examination of the entire record we have reached the conclusion that there was no such laches, failure to discover the fraud or to take steps to rescind, on the part of appellants, as to prevent them from repudiating their contracts of subscription as against the claims presented by the receiver and allowed by the judgment of the district court, but herein held to be inferior in equity to appellants.

From the stipulated facts it appears that Wellington Hammond filed a claim with the receiver in an amount of $7,000, representing a judgment against the company based upon an action brought to recover by reason of false and fraudulent representations of agents of the company in the sale of stock to him. To our minds this particular creditor occupies exactly the same position as appellants.

His claim is not superior. We entertain the view that no violence is done the general rule announced in actions of this character in holding that at the time Hammond brought his action and obtained his judgment he must be presumed to have known the true facts as they existed— that this corporation was a "fly-by-night" concern, brought into existence for the express purpose of cheating and defrauding farmers and others living in that section. The evidence is not sufficient to show that in subscribing for his stock Hammond relied on the subscriptions of others.

The claims of Frank DeKlotz and M. H. Vanderpool, in the amounts of $250 each, were for services in attending directors' meetings of the Sugar Company. Both men were qualified directors of the company and attended some fifty meetings. Equitably, these claims are inferior to those of appellants and cannot be said to have arisen by reason of any faith placed in the subscriptions of the stockholders. These directors are conclusively presumed to have known of the activities of the company and the fraudulent representations made by its agents.

The claim of A. A. Merrill, for $1,035, was incurred from December 1, 1919, to January 1, 1920, during the time the stock of the company was being sold to various subscribers. This claimant was a stockholder of the company as well as an employee and also one of the stock salesmen, and he must therefore have had knowledge of the fraudulent representations. For reasons stated hereinabove his claim would not be superior to the rights of appellants.

The claims of Fred Hinze for $3,201.54, DeKlotz, Handy and Vanderpool in the amount of $6,768.50, were incurred while they were stockholders and directors of the company. As directors they were presumed to know of the fraudulent representations of the company, or knowledge would be imputed to them, and it would be inequitable to hold their claims, in such circumstances, superior to the rights of defrauded subscribers to stock.

The Great Western Mortgage & Loan Company, made up of R. E. Holland and A. D. Erickson, who were

also stockholders of the company, brought an action to recover for alleged commissions for the sale of company stock, amounting to $20,430. From the stipulated facts it is shown that Holland and Erickson, under the name of the Great Western Mortgage & Loan Company, were appointed fiscal agents of the Sugar Company for the sale of its stock, and it was through them and salesmen appointed by them that large blocks of this stock were sold, and through these agents misrepresentations were made. There is no sufficient evidence in the record to sustain this claim upon the theory of the claimant being a *bona fide* creditor or innocent third party. On the contrary we think it clearly appears it was cognizant of the misrepresentations, or that such knowledge would be imputed to it as principal.

Coming now to the claim of the Central Union Trust Company, filed with the receiver and allowed by the district court as a valid, subsisting and unpaid claim against the Sugar Company: From the facts stipulated it appears that the trust company advanced money to the Sugar Company and accepted the latter's note, indorsed by Pettit-Marshall & Son, and a pledge of certain beet seed. The loan was for $21,000, the note being dated January 5, 1920, and bearing interest at the rate of six per cent. The agreement covering the pledged security recites among other things:

"In case of depreciation in the market value of the security hereby pledged . . . . for this loan, a payment is to be made on account on demand, so that the said market value shall always be at least twenty per cent more than the amount unpaid on this note."

The judgment filed by the receiver and allowed by the court is for $20,811.20, and is dated March 30, 1921. It will be observed that the amount of the judgment is within $188.80 of the amount of the original obligation. It is also observed that some of the subscription contracts and notes of the defrauded subscribers were executed prior to the note given to the trust company and a great many of them subsequent thereto. The query naturally arises as to

just what was the basis of the credit extended by the trust company. Was it with knowledge of the fraud upon the subscribers, or without knowledge of such fraud and upon the faith of the subscriptions, or upon the pledged property and the indorsement of the note by Pettit-Marshall & Son?

It would seem to us that the question to be determined is one of priority of equities between the creditor and the defrauded subscribers. In view of the state of the record touching this particular claim and the further fact that the trial court evidently relied upon the English rule as applied in such cases, rather than the American rule, thought to be more properly applicable, we have concluded to remand the cause for further proceedings in accord with this view as to the claim last mentioned.

We believe the evidence is sufficient to sustain the judgment as to other claims not herein specifically referred to. As to such claims the judgment is affirmed; otherwise it is reversed and the cause remanded. Costs are awarded to appellants.

Givens, C. J., and Lee, Varian and McNaughton, JJ., concur.