BAUER, Executor, Appellant, vs. FRANKLIN STATE BANK, Respondent.

*November 8—December 4, 1934.*

508

For the appellant there were briefs by *McGovern, Curtis &*
*Devos* of Milwaukee, and oral argument by *Francis E. Mc-*
*Govern.*

*George A. Affeldt* of Milwaukee, for the respondent.

NELSON, J.   Lenore H. Cawker, a resident of the city of
Milwaukee, in either April or early in May, 1929, applied to
the Franklin State Bank for a $15,000 loan.   The negotia-
tions for the loan, as well as those for its subsequent renewal
or partial renewal, were conducted on her behalf by one
Joseph P. O'Neill.   The rate of interest was to be nine per
cent if paid in advance and ten per cent if paid at maturity.
The loan was to be secured by her deeding to the bank cer-
tain vacant real estate owned by her.   Arrangements for the

loan having been made Lenore H. Cawker, on May 11, 1929, executed and delivered to the bank her demand collateral note for $15,000. At the same time she made and delivered to the bank three judgment notes, each in the amount of $5,000, payable ninety, one hundred and twenty, and one hundred and fifty days after date, respectively. She also made, executed, and delivered to the bank two deeds conveying to it certain real estate belonging to her. The judgment notes were apparently taken so that the bank, in case of default, might immediately enter judgment upon them and thereby acquire a lien or liens upon all of her other real estate. The full amount of the $15,000 was credited to an account opened by her in the bank at that time. As the judgment notes matured she was unable to pay the principal thereof and renewal notes were given to the bank. Concededly certain interest payments were made. The first judgment note for $5,000 became due ninety days after its date. It was apparently renewed for thirty days on August 14th, so that it would mature at about the same time that the second $5,000 judgment note became due. When the two notes just mentioned became due on or about September 6th, a renewal judgment note for $10,000 was given by her to take up those notes. That note was payable in thirty days and became due at about the same time that the third $5,000 judgment note matured. When the two notes just mentioned became due in October a new judgment note for $15,000 was executed and delivered to the bank. When that note became due on or about January 25, 1930, a renewal judgment note for $15,000, payable ninety days after its date, was executed by her and delivered to the bank. When that note was not paid at maturity the bank caused a notice of a proposed sale of the real estate, described in the deeds, to be served upon her. This action was thereafter commenced by her to restrain the bank from proceeding to sell the real estate, or to foreclose the deeds as mortgages

until the amounts of the asserted usurious payments had been determined and the full legal penalty deducted from the amount of her indebtedness. She alleged in her complaint that the bank had exacted usurious payments in the form of bonuses and commissions for the making of the original loan and the renewals thereof amounting to $1,125. In the answer made by the plaintiff executor to the foreclosure complaint (stipulated to be a cross-complaint) the amount of the usurious payments was asserted to be $1,425. In a subsequent first amendment to his answer the usurious payments were asserted to be $1,775. In a subsequent second amendment the amount was alleged to be $2,450.

Upon the trial of this action the only issue contested was whether Joseph P. O'Neill, acting for Lenore H. Cawker, had paid to the bank, for the purpose of inducing it to make the loan and to extend or renew it, moneys as bonuses or commissions which, when added to the interest payments concededly made to the bank, exceeded the ten per cent rate of interest which the bank might legally charge and collect.

The trial court found that the evidence adduced failed to establish that O'Neill, as the agent of Lenore H. Cawker had paid to the bank any moneys in excess of the legal rate of interest in consideration of the making of the loan or the granting of the renewals. The court also found that even assuming that payments were made in excess of the legal rate of interest such payments were made to one Johnson individually, who was at the times the cashier of the bank, and for his sole benefit, without the knowledge of the bank and for the purpose of obtaining his influence to secure the original loan and the granting of extensions in violation of sec. 221.40 of the statutes.

The plaintiff assigns as error the failure of the trial court to find in his favor. Twenty-nine assignments of error based on the court's findings of fact and conclusions of law are

listed. Nearly all of the errors assigned and argued simply raise the question as to whether the findings of fact are sustained by the evidence.

It is well established that findings of fact will not be disturbed on appeal unless they are against the great weight and clear preponderance of the evidence. *Timme v. Squires,* 199 Wis. 178, 225 N. W. 825; *Zolandek v. First National Bank,* 212 Wis. 632, 250 N. W. 391; *Estate of Fish,* 214 Wis. 464, 253 N. W. 387; *Estate of Soles,* 215 Wis. 129, 253 N. W. 801.

Obviously the burden of proof rested upon the plaintiff to show that the asserted usurious payments were made to the bank. *Hale v. Haselton,* 21 Wis. *320, 325; *Friedman v. Wisconsin Acceptance Corp.* 192 Wis. 58, 210 N. W. 831.

Since the facts essential to a recovery by the plaintiff also constitute a crime (sec. 115.07), the rule requiring a clear and satisfactory preponderance of the evidence is applicable. *Poertner v. Poertner,* 66 Wis. 644, 29 N. W. 386; *Maldaner v. Smith,* 102 Wis. 30, 78 N. W. 140; *Wunderlich v. Palatine Ins. Co.* 115 Wis. 509, 92 N. W. 264; *Trzebietowski v. Jereski,* 159 Wis. 190, 149 N. W. 743; *White v. Benjamin,* 138 N. Y. 623, 33 N. E. 1037.

So the single question for determination is whether the proof adduced by the plaintiff upon the trial so clearly and satisfactorily shows that usurious payments were exacted and accepted by the bank as to permit us to say that the findings of the trial court are against the great weight and clear preponderance of the evidence.

Although the books of the bank tended to show that no usurious payments were made to it, the plaintiff sought to prove by the testimony of Joseph P. O'Neill, taken at his adverse examination before trial at the instance of the bank, that usurious payments were made. After O'Neill was examined and before the trial, he died. No useful purpose would

be served by reviewing all of his testimony. A single incident testified to by O'Neill will suffice to show why the trial court probably deemed much of his testimony, if not all of it, except that relating to the undisputed interest payments, incredible. O'Neill testified that on May 10, 1929, he paid $500 in cash to Johnson, the bank's cashier, as a bonus or commission for obtaining the Cawker loan; that after negotiating the loan and delivering to the bank a note for $5,000 signed by Miss Cawker, which amount was credited in her pass book, he left the bank but returned shortly thereafter with a $600 check which was payable to his order or to cash, and which was signed by Miss Cawker; that he cashed this check at the bank and out of the proceeds paid Johnson $500 in cash and himself retained $100 for attorney's fees, abstract extensions, etc. The plaintiff executor produced a check dated May 10, 1929, payable to the order of Joseph O'Neill in the amount of $600 drawn by Lenore Cawker against her account in the bank. It appears that, while some of the negotiations for the loan occurred on May 10th, the transaction was not completed until the following day. The $15,000 was credited to Miss Cawker's account on May 11th. The $600 check was indorsed and deposited by O'Neill to the credit of his personal checking account. On May 11th, the $600 check was charged to Miss Cawker's account. The only charge against O'Neill's account on May 11th was a $200 item which was a check drawn by him and delivered to the bank for which credit was given as appears from the books of the bank. No other $600 item was charged to Miss Cawker's account up to the end of the year. It conclusively appears that O'Neill did not cash the $600 check; that he could not have paid $500 to Johnson out of the proceeds of that check, and that no more than $200 was at that time paid to the bank by O'Neill. It is argued by the bank from these facts that the inference that O'Neill converted the proceeds

of Miss Cawker's check with the exception of the $200 paid to the bank is much more reasonable than that he paid $500 to Johnson as cashier of the bank. If the trial court considered O'Neill's testimony regarding the asserted payment of $500 to Johnson false, then it was justified in concluding that his other testimony was incredible. His testimony was at times confused, uncertain, and contradictory. It further appears that O'Neill, while serving as a federal prohibition director, a position of trust under the government of the United States, corruptly conspired with others to violate the national prohibition law, and was convicted of that offense upon his plea of guilty. The testimony of one who, for personal gain, has corruptly violated his oath of office and basely betrayed a trust which he should have regarded as almost sacred, may well be subjected to severe scrutiny and disbelieved if deemed incredible.

After a careful consideration of all the evidence we are of the opinion that the findings of the trial court should not be disturbed.

*By the Court.*—Judgment affirmed.